# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MYRON HOBBS,**

      **Plaintiff,**

                **Case No. 1:20-cv-1040**

    **v.**                **JUDGE DOUGLAS R. COLE**

**FIFTH THIRD BANK, N.A., et al.,**

      **Defendants.**

## OPINION AND ORDER

This cause is before the Court on Plaintiff Myron Hobbs' Motion for Preliminary Injunction (Doc. 26). For the reasons discussed more fully below, the Court **DENIES** Hobbs' Motion.

## FACTUAL BACKGROUND

Myron Hobbs began working for Epic Insurance Solutions, LLC ("Epic Solutions") as an insurance broker in late 2014. (Am. Hobbs Aff., Doc. 37-2, #1466). When Hobbs joined Epic Solutions, he brought a book of business valued at approximately $852,000. (2014 Empl. Agreement ("Epic Agreement"), Doc. 37-4, #1519). As consideration for the acquisition of "certain accounts" (i.e., the accounts that Hobbs brought with him), Epic Solutions paid Hobbs' previous employer, Insuramax, approximately $412,500. Epic Solutions also paid off a commercial loan between Hobbs and a bank in the amount of approximately $150,000, and agreed to pay Hobbs $300,000 in three annual installments of $100,000 each. (*Id*.). The accounts that Hobbs brought to his new employer included some long-term

commercial insurance customers with whom Hobbs had been working, in some cases, for decades. (*See* Am. Hobbs Aff., Doc. 37-2, #1466).

Hobbs' compensation arrangement with Epic Solutions included a commission structure. Specifically, Hobbs was to receive an assigned percentage (that varied as described below) of any commission payments that Epic Solutions received for policies Hobbs sold (whether to new or existing customers). The commission arrangement also specifically addressed the customers that Hobbs brought with him. As to those customers, if Hobbs remained employed and retained those customers for four years from the time he came to work for Epic Solutions (or, in other words, until December 1, 2018), Epic Solutions agreed to fix his commission percentage at 40% on all policies written for those customers, whether new or renewal, "until the termination of [his] employment." (Epic Agreement, Doc. 37-4, #1520). And the new or renewal part of that mattered—typically, agents are paid more on new business than on renewal business. (*See* Hr'g Tr. Vol. 2, Doc. 36, #1200 ("Agencies pay different amounts for new business …. It's more incentive for producers to … write new business so that they can get a higher percentage for that first year ….")).

In addition to the commission arrangement. Hobbs also negotiated a change-in-control bonus. This term provided that, if Epic Solutions was sold or changed hands, Hobbs would be immediately entitled to a lump-sum payout calculated by reference to his production from the previous year. (Epic Agreement, Doc. 37-4, #1523–24). However, Hobbs' entitlement to that bonus was contingent on Hobbs having been employed at Epic for ten years at the time the change in control occurred.

(*Id.* at #1523 ("In the event that Employee ceases to be employed by [Epic Solutions] before the one hundred and twenty [] month anniversary of … this Agreement …, then the [change-in-control bonus] … shall be immediately … cancelled ….")). The Epic Agreement also included a non-solicitation provision which prohibited Hobbs from engaging with current or prospective Epic Solutions customers for twenty-four months following his termination from Epic Solutions, regardless of the reason for that termination. (*Id.* at #1521).

Fifth Third Insurance Agency, Inc. ("FTI"), a subsidiary of Fifth Third Bank, N.A. ("Fifth Third"), acquired Epic Solutions in 2017. (Interest Purchase Agreement, Doc. 37-7). The parties accomplished the acquisition through a two-step process. First, Epic Solutions assigned all of its contractual rights and assets to Epic Solutions Insurance Agency, LLC ("Epic Agency"), an entity that Epic Solutions formed to facilitate the transaction, and as to which Epic Solutions was the sole member. (*See id.* at #1592). Then, FTI purchased from Epic Solutions that LLC member interest, thereby becoming the sole owner of Epic Agency. (*See id.* at #1592, 1603). As part of this transaction, Epic Solutions had assigned to Epic Agency the existing contract (and included restrictive covenant) between Epic Solutions and Hobbs. Indeed, the documents detailing the transaction between Epic Solutions and FTI identify the Hobbs contract as one of the "Material" contracts that FTI would be acquiring through its acquisition of Epic Agency. (*Id.* at #1606).

In connection with the acquisition, FTI formally offered Hobbs employment with the acquired entity (i.e., Epic Agency) through a letter dated September 26,

2017. (Offer Letter, Doc. 37-8). That letter provides that "following its acquisition by [FTI], [Epic Agency] will become an indirectly wholly-owned subsidiary of Fifth Third Bancorp (collectively "Fifth Third")." (*Id.* at #1611). The Offer Letter appears to incorporate Hobbs' commission structure from the Epic Agreement into Hobbs' new employment arrangement, noting that Hobbs' "initial commission structure at Fifth Third [would] be consistent with [his] current commission structure." (*Id.*). The Offer Letter did not contain any restrictive covenants, but did include a deferred incentive payment of $25,000 in restricted stock units of Fifth Third Bancorp, subject to a three-year cliff vesting period (i.e., the stock units would all vest at the end of the three-year period, rather than vesting gradually over the term of his employment). According to the Offer Letter, that award would become "effective on the first business day of the quarter following [the third anniversary of] your start date." (*Id.*). Hobbs accepted the offer and joined Epic Agency, which now had a new corporate parent, FTI.

In early 2018, these corporate machinations, coupled with various alleged exchanges between the parties, start making the operative facts here a little murky. For example, all agree that Hobbs' new employer instructed him to acknowledge a Fifth Third "Incentive Compensation Plan" ("IP"), but the identities of the exact parties to that agreement are not as clear. The agreement undoubtedly relates to Hobbs' compensation for providing insurance services on behalf of Epic Agency, but the document itself states that the counter-party is "Fifth Third," which is a defined term that refers to "Fifth Third Bank, National Association (including its parent

companies, subsidiaries, and affiliates, collectively 'Fifth Third,['] the 'Bank,' or 'Employer')." (2018 IP, Doc. 37-13, #1652).

In addition to potential confusion surrounding the contracting parties, there also appears to be some dispute regarding the IP's operative effect. According to Hobbs, his boss, Donald Thompson, assured him that the IP was a "formality" and would not change the terms of his compensation under the Epic Agreement. Moreover, an email from Thompson seems consistent with Hobbs' assertion. (Am. Hobbs Aff., Doc. 37-2, #1468; Feb. 12 Thompson Email, Doc. 37-12, #1648 ("[N]o changes in your agreement, this is just their paperwork!!")). But, while Thompson may have said that, the IP's plain language set out a commission structure of 40% on new business, but only *30%* on renewal business. That differed from the 40%/40% structure set forth in the Epic Agreement (pursuant to the "grandfathered commission" provision) and the Offer Letter. (*Compare* 2018 IP, Doc. 37-13, #1653 *with* Epic Agreement, Doc. 37-4, § 1.9(b)(3), #1520).

The 2018 IP included a restrictive covenant in the form of a two-year non-solicitation clause. That clause prohibited Hobbs from soliciting, attempting to solicit, or otherwise engaging with Fifth Third customers with whom Hobbs interacted while at Fifth Third for two years after he left his employment under the IP. (2018 IP, Doc. 37-13, #1660–61).

The 2018 IP also spoke to assignability. In particular, it states that Fifth Third "retains the right … to assign its rights and obligations under the [2018 IP] to any successor in interest or purchaser of substantially all of Fifth Third's assets." The IP

then goes on to provide that "[i]n the event of such an assignment, the benefits and burdens of this [2018 IP] shall inure to the benefit of and is binding upon the successor or assignee of Fifth Third." (*Id.* at #1664).

Hobbs asserts that, notwithstanding the language of the 2018 IP, Fifth Third actually continued to pay Hobbs throughout most of 2018 under the commission structure set forth in the Epic Agreement (i.e., 40%/40%), rather than the commission structure in the 2018 IP. (Hr'g Tr. Vol. 1, Doc. 35, #921). According to Hobbs, this was not surprising, as Thompson had told Hobbs—before Hobbs acknowledged the 2018 IP—that the IP was only paperwork and would not affect Hobbs' compensation. (*See* Feb. 12 Thompson Email, Doc. 37-12, #1648–49).

This understanding regarding commissions (to the extent that it existed) evidently changed in late 2018, at least from the Fifth Third side. In particular, Thompson informed Hobbs that, effective January 2019, the Epic Agreement's 40% "grandfathered commission" as to renewal business would no longer remain in place. (Hr'g Tr. Vol. 1, Doc. 35, #924–26; Hr'g Tr. Vol. 2, Doc. 36, #1197–98). Instead, Thompson said, Fifth Third would begin paying Hobbs based on the commission structure set forth in the upcoming 2019 IP (which mirrored the 40%/30% in the 2018 IP, not the 40%/40% grandfathered structure). (Hr'g Tr. Vol. 2, Doc. 36, #1197).

At the evidentiary hearing, Hobbs testified that reducing his commission percentage rate from 40% to 30% on renewal policies for long-term customers represented a loss in compensation to him of about $65,000 per year. (Hr'g Tr. Vol. 1, Doc. 35, #927). Hobbs says he expressed concern over this change to Thompson. Hobbs

6

further claims that Thompson responded to these concerns by suggesting that, if Hobbs quit Fifth Third and attempted to maintain relationships with his existing customers, Fifth Third would enforce the restrictive covenant in the 2018 IP. (Hr'g Tr. Vol. 1, Doc. 35, #926–27, 929).

Hobbs further says that, as an alternative to that contractual stick, Thompson offered him a carrot. Specifically, Thompson told Hobbs that Fifth Third could help him recoup some of this lost income by "gifting" Hobbs certain accounts as to which there was no agent in place. (Hr'g Tr. Vol. 1, Doc. 35, #933; Hr'g Tr. Vol. 2, Doc. 36, #1210–11). Hobbs asserts that he acknowledged the 2019 IP, which contained provisions substantially identical to the 2018 IP, in reliance on this "promise" of gifted accounts. On certain of these gifted accounts, though, Hobbs received less than 100% "production credit," a measure used in conjunction with commission percentage to determine total payable commissions. (*See* Hr'g Tr. Vol. 1, Doc. 35, #931, 933–34). Partially because of the less-than-100% production credit, and in part because the overall production from these gifted accounts was less than Hobbs expected, Hobbs made only approximately $31,000 on those gifted accounts for all of 2019 and 2020, substantially less than he claims he would have received but for the reduction from 40% to 30% in commission rate for his renewal business. (*See* Hobbs Commission Spreadsheet, Doc. 37-20, #1731).

Sometime in late 2019 or early 2020, Hobbs acknowledged a 2020 IP. In terms of the counter-party definition and the restrictive covenant assignability provisions,

which are the key provisions here, the 2020 IP was identical to the 2019 and 2018 IPs described above. (2020 IP, Doc. 37-19, #1714, 1724–25).

On December 4, 2020, shortly before Hobbs was set to vest in the Fifth Third shares that he had received in connection with the 2017 FTI/Epic Solutions transaction, Foundation Risk Partners ("FRP") purchased substantially all of the assets of FTI and Epic Agency. (Asset Purchase Agreement, Doc. 37-21). Related to this transaction, Hobbs received an offer letter from FRP with an effective start date of January 1, 2021. (FRP Offer Letter, Doc. 37-23). This offer once again included a non-solicitation provision as a condition to employment. (*Id.* at #1766).

In connection with the transaction, Hobbs also received from Fifth Third a document titled "General Release of All Claims," which provided that if (1) the deal between Fifth Third[1] and FRP successfully closed in 2020; (2) Hobbs accepted the offer of employment by FRP; (3) Hobbs became employed by FRP; (4) Hobbs agreed to the Fifth Third Release; and (5) Hobbs complied with the terms of the Fifth Third Release, then Fifth Third would pay Hobbs $22,522.80. (General Release of All Claims, Doc. 37-25, #1790). This was approximately the same value as the not yet, but soon to be, vested Fifth Third restricted stock units. (Hobbs' Fidelity NetBenefits Screenshot, Doc. 37-26, #1800). Indeed, those units were set to vest on January 2, 2020. (*Id.*).

---

[1] Although the Asset Purchase Agreement (Doc. 37-21) does not include Fifth Third Bank, N.A. as a "Selling Party," the General Release references the FTI/FRP transaction as occurring between "Fifth Third Bank, National Association and Foundation Risk Partners." (General Release of All Claims, Doc. 37-25, #1790).

Hobbs did not sign the General Release or accept the employment offer from FRP. (Am. Hobbs Aff., Doc. 37-2, #1475–76). Hobbs' supervisors at Epic Agency treated the failure to join FRP as an effective resignation from FTI (Epic Agency's parent) on December 22, 2020. (*See id.* at #1476). Hobbs contests that characterization of his actions. Nevertheless, Fifth Third takes the position that, as a result of Hobbs' purported "resignation," his restricted stock units did not vest.

Hobbs filed his first Complaint on December 31, 2020, asserting claims against Fifth Third for breach of contract and declaratory relief or, in the alternative, injunctive relief. (Doc. 1). He amended his Complaint two months later to add claims for promissory estoppel and unjust enrichment against Fifth Third and claims for declaratory relief and tortious interference against FRP. (*See* Doc. 8). FRP counter-claimed for breach of contract, unfair competition, tortious interference, and injunctive and declaratory relief. (Doc. 21). Hobbs filed the instant Motion for Preliminary Injunction on June 4, 2021. (Doc. 26). The Court heard two days of evidence on July 21 and 22, and the parties undertook post-hearing briefing, which the parties completed on October 26, 2021. The Motion for Preliminary Injunction is now ready for the Court's review.

## LAW AND ANALYSIS

This case presents in a somewhat odd procedural posture. Hobbs, a former employee of certain of the Defendants, seeks a preliminary injunction designed to prevent Defendants Fifth Third and FTI, and Defendant/Counter-Plaintiff FRP, "from enforcing, or attempting to enforce, the terms of certain restrictive covenants

in employment contracts between Mr. Hobbs and his former employers, as well as enjoining them from misrepresenting to customers and potential customers that Mr. Hobbs is precluded from doing business with them." (Mot. For Prelim. Inj., Doc. 26, #382). In other words, Hobbs essentially wants a preliminary injunction enjoining the Defendants from seeking a preliminary injunction against him.

That represents a u-turn from the typical non-competition case. Usually, the former employer seeks a preliminary injunction preventing the former employee from violating the restrictive covenant during the pendency of the litigation. That being said, Hobbs cites several cases suggesting that a court can issue an injunction in favor of an employee, and against the former employer, in appropriate circumstances. (Pl. Post-Hr'g Br. in Supp., Doc. 37, #1371 (*citing Bryan v. Hall Chemical Co.*, 993 F. 2d 831 (11th Cir. 1993); *Enron Capital & Trade Res. Corp. v. Pokalsky*, 490 S.E.2d 136 (Ga. Ct. App. 1997); *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269–70 (11th Cir. 2003); *Frank v. Wesco Distrib., Inc.*, 892 N.Y.S.2d 348 (N.Y. App. Div. 2009); *Yedlin v. Lieberman*, 961 N.Y.S.2d 186 (N.Y App. Div. 2013); *Lingo v. NVR*, Inc., No. 07–cv–03892–JF, 2008 WL 510128 (E.D. Pa. Feb. 22, 2008))). To be sure, as Defendants point out, these cases generally involve covenants not to compete, which are broader than the non-solicitation provision at issue here, but that does not render these cases so distinguishable as to preclude relief altogether on such a theory here.

That being said, Hobbs still must show that he is entitled to such relief, and must establish that entitlement by clear and convincing evidence. *Honeywell, Inc. v. Brewer-Garrett Co.*, No, 97-3673, 1998 WL 152951, at *3 (6th Cir. Mar. 23, 1998)

10

(citing *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968)). In deciding whether he has met that burden, the Court must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam) (internal quotation marks omitted).

## A.    Hobbs Has Shown Some Likelihood of Success on the Merits

To show he is entitled to the "extraordinary remedy" of a preliminary injunction, Hobbs must first establish that he is likely to succeed on the merits of his claims. *Donaldson v. United States*, 86 F. App'x 902, 902–03 (6th Cir. 2004). In this case, that showing requires him to establish a likelihood (though not a certainty) that the restrictive covenants Defendants might seek to assert against him are invalid or unenforceable (i.e., the issue on which he seeks declaratory relief through this lawsuit). Moreover, the stronger his showing on this front (assuming he can make any such showing at all), the lesser the showing required on the other elements to justify a preliminary injunction. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) (noting that the preliminary injunction considerations are "factors to be balanced," and that "the degree of likelihood of success required may depend on the strength of the other factors").

11

At this point in the proceedings, the only disputed agreement is the 2020 IP and, more specifically, the non-solicitation provision contained therein. That is because FRP disclaimed reliance on the 2014 Epic Agreement or any other restrictive covenant in its post-hearing response brief. (FRP Post-Hr'g Br. in Opp., Doc. 40, #2129 ("FRP is limiting its enforcement efforts to enforcing only the two-year non-solicitation of customers covenant contained in the 2020 Incentive Plan Hobbs executed with the Fifth Third Defendants ….")). And Fifth Third likewise disclaimed reliance on any agreement other than the 2020 IP at the evidentiary hearing on July 21, 2021. (Hr'g Tr. Vol. 1, Doc. 35, #828 ("Fifth Third's position[] is that the operative restrictive covenant is the one in the 2020 agreement.")).

In support of his Motion for Preliminary Injunction, Hobbs makes two general arguments regarding the likelihood that he will be able to show that the non-solicitation provision in the 2020 IP is invalid or unenforceable. First, he argues that Fifth Third did not properly assign the 2020 IP to FRP, and that Fifth Third itself lacks the competitive interest necessary to enforce the restrictive covenant. (Pl. Post-Hr'g Br. in Supp., Doc. 37, #1380–81). Second, he argues that, even if Fifth Third properly assigned the 2020 IP, it is unenforceable as to Hobbs for various reasons. These reasons, Hobbs argues, include that the IPs (including the 2020 IP): (1) fail for lack of consideration due to Fifth Third's unilateral reduction of renewal commissions and subsequent failure to assign Hobbs sufficient accounts to make up for the loss; (2) were obtained under economic duress; (3) were materially breached by Fifth Third; (4) are unconscionable contracts of adhesion; and (5) are unenforceable illusory

contracts. (*Id.* at #1390–1402). Because the Court concludes that Hobbs has established some likelihood of success on his failure-to-properly-assign argument, the Court will discuss only that point.

**1. Hobbs Has Established A Likelihood That He Will Be Able To Show That Fifth Third Did Not Properly Assign The 2020 IP, And Lacks Standing To Enforce The Restrictive Covenant Itself.**

At the outset, the Court observes that Ohio law generally allows assignment of restrictive covenants in employment agreements. *Artromick Internatl., Inc. v. Koch*, 759 N.E.2d 385, 387 (Ohio Ct. App. 2001). And, here, the IP expressly addresses assignability. The question, then, is whether the purported assignment at issue here is consistent with the contractual language regarding assignment. Most of Hobbs' arguments regarding whether the IP was properly assigned to FRP revolve around establishing which entities, exactly, were parties to (1) the 2020 IP (the agreement between Hobbs and "Fifth Third"), and (2) the Asset Purchase Agreement ("APA") by which FTI sold all or substantially all of its assets to FRP.

Starting with the 2020 IP, Hobbs argues that Fifth Third, National Association (the "Bank") is the identified counterparty. And assignability under the 2020 IP is limited to the counterparty's "successors in interest" or purchasers of "all or substantially all of" the counterparty's assets. Here, Hobbs observes, FRP is neither a "successor in interest" to the Bank, nor did FRP purchase "all or substantially all of" the Bank's assets. Thus, he says, the Bank could not have assigned the 2020 IP to FRP. (Pl. Post-Hr'g Br. in Supp., Doc. 37, #1381–82).

13

In response, the Fifth Third Defendants point out that the 2020 IP defines Fifth Third, National Association to "includ[e] its parent companies, subsidiaries, and affiliates," and the title of the IP is "2020 Incentive Compensation Plan[,] *Fifth Third Insurance Agency*[,] Insurance Advisor." (Fifth Third Post-Hr'g Br. in Opp., Doc. 39, #2094) (emphasis added)). From this, they claim that FTI, as a subsidiary or affiliate, has rights under the IP. They then rely on the same language that Hobbs cites, which allows FTI (if it "counts" as a counterparty) "without further notice or consent to assign its rights and obligations under the Plan to any successor in interest or purchaser of substantially all of [FTI]'s assets." (*Id.* (citing 2020 IP, Doc. 37-19, #1714, 1728)).

Importantly, it appears that Defendants are arguing that the definition of Fifth Third means that *each* of the Bank's affiliates and subsidiaries, of which FTI is one, were parties to the contract, and that, as such, each entity could assign the rights attendant to the restrictive covenant based on a sale of all or substantially all of that entity's assets. (*See* FRP Post-Hr'g Br. in Opp., Doc. 40, #2141 ("Fifth Third Insurance was a subsidiary of Fifth Third Bank, N.A. and thus a party to the 2020 Incentive Plan. ... [The] Incentive Plan gives Fifth Third Bank, N.A.—again, including its parent companies, subsidiaries, and affiliates—the right to assign its rights and obligations under the Plan.")). Then, having established FTI as one of many entities with assignment rights, Defendants further argue that FTI exercised that right through the APA between FTI and FRP. The APA lists FTI (though not the Bank) as a "Selling Party" and includes in the "purchased assets" "all rights of a Selling Party

14

under all Contracts relating to the Business … and further including all rights of Selling Parties under any non-competition, non-solicitation, non-piracy, or other restrictive covenants in favor of a Selling Party...." (*Id.* at #2140 (quoting Asset Purchase Agreement, Doc. #37-21, #1737)).

Admittedly, the language in the IP *could* be read in the manner that Defendants suggest. But the Court is not convinced—at least not at this juncture. To start, Defendants' interpretive argument does not make much sense. They assert that *any* affiliate or subsidiary could claim to be the counterparty on the 2020 IP for purpose of the assignment clause. Really? So, if some *other* Fifth Third, N.A. subsidiary (or parent or affiliate), one that has nothing to do with insurance, were to sell all or substantially all of its assets, that subsidiary would have the ability, in connection with that sale, to assign Hobbs' restrictive covenant under the 2020 IP? That doesn't seem like an appropriate understanding of the agreement, yet that is what the Fifth Third Defendants appear to argue here.

Not only is this argument problematic on these practical grounds, but the authorities that Defendants cite do not support the fungible view of corporate identities that Defendants advocate. For example, Fifth Third cites *Masco Cabinetry Middlefield, LLC v. Cefla N. Am., Inc.*, 637 F. App'x 192 (6th Cir. 2005), for the proposition that both a parent and subsidiary have the right to assert a restrictive covenant. (Fifth Third Post-Hr'g Br. in Opp., Doc. 39, #2096). In that case, the Sixth Circuit admittedly held that both a parent and subsidiary could assert a two-year contractual limitations period even where the parent company was not an explicit

party to the contract. But that case considered whether "separate corporate existence should be disregarded in relation to contractual responsibilities [] because the subsidiary acted as 'mere instrumentality or adjunct' of the parent" in entering the contract. *See Masco*, 637 F. App'x at 201. And the Sixth Circuit, while noting that such a question is in each case sui generis (under Michigan law), found only that the appellant fell "far short" of showing an abuse of discretion by the trial court in determining that the necessary agency relationship existed. *Id.* Here, there is no indication that the Bank was acting as FTI's agent in entering the 2020 IP.

Thus, although this case is admittedly still in its infancy, the Court concludes, at least for now, that Hobbs has the better of this argument. "[P]arent and subsidiary corporations are separate and distinct legal entities, 'even if the parent owns all the outstanding shares of the subsidiary.'" *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 117 (Ohio 2006) (quoting *Mut. Holding Co. v. Limbach*, 641 N.E.2d 1080, 1081 (Ohio 1994)). And "[a]bsent specific authorization, a parent corporation may not bind a subsidiary." *Id.* (citing *Linko v. Indemn. Ins. Co. of N. Am.*, 739 N.E.2d 338 (Ohio 2000)). Here, it appears from the face of the document that the parties to the 2020 IP were Hobbs and Fifth Third, N.A.—the Bank. Nowhere in the document does FTI or Epic Agency, or any other Fifth Third subsidiary or affiliate, indicate its acquiescence to this IP.

To be sure, Fifth Third could perhaps have created the assignment rights in FTI under some type of third-party beneficiary theory. That is, Fifth Third and Hobbs could have executed an agreement in which Hobbs agreed that FTI would have

assignability power over the non-solicit provision. But, if that is what Fifth Third and Hobbs intended, the language surrounding assignment could have been much clearer in that regard. That theory would not treat FTI as merely one of many "subsidiaries" or "affiliates," but rather would make FTI (as Hobbs' direct employer in the Fifth Third corporate structure) unique. Beyond the inclusion of FTI's name in the IP's title, though, Fifth Third points to no language establishing a likelihood of prevailing on this FTI-is-unique-as-compared-to-other-subsidiaries theory.

At bottom, the Court is not convinced that the IP is correctly understood as granting *every* Fifth Third subsidiary and affiliate the right to assign the non-solicitation rights under the IP based on that subsidiary or affiliate's sale of substantially all of its assets. Nor is the Court convinced that the IP uniquely assigns those rights to one such subsidiary or affiliate—FTI. But, if neither of those is the case, then it is the Bank itself that has the assignment rights, and it retained the right to assign only upon a sale of all or substantially all of the Bank's assets, which all agree did not occur here. The Court concedes that this last reading of the IP leads to its own incongruities—why would assignment of the rights at issue here turn on sale of the Bank itself, rather than FTI, or perhaps Epic Agency? But language matters, and where the parties have not taken sufficient care to make their intent apparent through the language they use, that puts courts in a bit of a bind.

Perhaps the most accurate thing to say would be that the contract is somewhat opaque on exactly who constitutes "Fifth Third" for purposes of the assignment question here. But if that is correct, that ambiguity presents a further problem for

17

Defendants. Ohio courts typically construe ambiguity against the drafter. *Spangler v. Spangler*, 451 F. Supp. 3d 813, 828–29 (N.D. Ohio 2020) ("[T]o the extent we encounter an ambiguity in the contract, that ambiguity must be construed against the drafting party.") (quoting *Ottery v. Bland*, 536 N.E.2d 651, 654 (Ohio Ct. App. 1987)). Here, that is Fifth Third. To be sure, this interpretive principle is subject to limits under Ohio law. But, at this stage of the proceedings, the principle nonetheless offers further support to Hobbs' likelihood of success on his assignment argument. Whether Hobbs will in fact prevail on that argument is, of course, a separate question, but also one that the Court need not consider for current purposes.

If Hobbs were to succeed on his non-assignment argument, two things would follow. First, FRP could not enforce the covenant. That means that FRP would not have a basis for proceeding against Hobbs for Hobbs' conduct in soliciting clients.

But second, Fifth Third would likely be unable to enforce the covenant, as well. That may seem surprising at first glance. After all, if Fifth Third did not assign the covenant, the Bank presumably retains it. But, as Hobbs notes, merely having a restrictive covenant is not enough to support enforcement of that covenant under Ohio law. (*See* Pl. Post-Hr'g Br. in Supp., Doc. 37, #1387 ("[T]he Fifth Third Covenant … is not enforceable because it is not necessary to protect the goodwill of [] Fifth Third ….")). Rather, Fifth Third also must have a legitimate business interest to protect. *Castillo-Sang v. Christ Hosp. Cardiovascular Assocs., LLC*, NO. C-200072, 2020 WL 7647952, at *4 ("Under *Raimonde*, restrictive covenants are enforceable

only to the extent necessary to protect an employer's legitimate business interests.") (citing *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975)).

Here, Hobbs argues, Fifth Third is no longer in the insurance business, and thus has no legitimate competitive interest in that market. (Pl. Post-Hr'g Br. in Supp., Doc. 37, #1387). In response, Fifth Third notes in passing that it "invested significant resources to service and maintain customers with which Hobbs had relationships," but seems to stop short of claiming that it retains a legitimate, protectible interest. (*See* Fifth Third Post-Hr'g Br. in Opp., Doc. 39, #2097). And this makes sense. Hobbs' solicitation of his former customers—even those Fifth Third may have "invested in"— can no longer injure Fifth Third, given that Fifth Third is no longer competing for those customers.

FRP tries a different tack. It argues that Fifth Third has a "protectable interest in ensuring the transition" of the customer goodwill that Fifth Third sold to FRP. (FRP Post-Hr'g Br. in Opp., Doc. 40, #2143–44). This argument also falls short. Even if the "transition of goodwill" were a protectible interest in the abstract, the terms of the non-solicitation provision apply specifically to "the sale or provision of any product or service *that competes with a product or service offered by Fifth Third*." (2020 IP, Doc. 37-19, #1724). Fifth Third does not sell insurance. At least, it no longer sells the types of insurance that Hobbs sold. (Excerpt of Gephart Dep., Doc. 37-27, #1803 (testifying that Fifth Third retains a "[h]igh net worth life insurance" business)). Thus, to the extent that Fifth Third, N.A. failed to assign that contract to FRP (which

19

presumably would have made the products "offered by FRP" the relevant inquiry), the covenant is a non-issue.

Finally, FRP seeks to escape entirely the assignability conundrum that the 2020 IP creates by arguing that none of the above analysis on assignment is necessary. Rather, FRP asserts that the 2020 IP was assigned by operation of law based on the Ohio Supreme Court's decision in *Acordia of Ohio, L.L.C. v. Fishel*, 978 N.E.2d 823 (Ohio 2012). There, the Ohio Supreme Court considered the effect of statutory mergers under the Ohio Revised Code. The court found that, after such a merger, "[t]he merged company has the ability to enforce noncompete agreements as if the resulting company had stepped into the shoes of the absorbed company," even absent language in the noncompete agreements indicating they could be enforced by "successors or assigns." *Acordia*, 978 N.E.2d at 826. In other words, the company that results after the merger is treated as the pre-merger contract entity for purposes of enforcing the covenant.

*Acordia*'s holding, though, explicitly refers to mergers, whereas the transaction between Fifth Third and FRP was undisputedly an asset purchase. (*See* Asset Purchase Agreement, Doc. 37-21, #1733). FRP argues that *Acordia* nonetheless applies because the asset purchase here should be considered a "de facto merger" based on *McGaw v. South Bend Lathe, Inc.*, 598 N.E.2d 18 (Ohio Ct. App. 1991). But even if FTI "de facto" merged with FRP—an issue the Court does not reach—that would not necessarily solve the problem. That merger presumably would allow FRP to step into the shoes *of FTI*. But, as described above, Hobbs has established at least

20

a likelihood that the 2020 IP was not FTI's to enforce, either. Rather, Fifth Third, N.A. appears to be the counterparty.

For the reasons above, the Court concludes that there is at least some likelihood—although by no means a certainty—that Hobbs will succeed in proving the 2020 IP was not properly assigned to FRP, and that the covenant is at this point unenforceable by Fifth Third. As such, the first prong of the preliminary injunction factors weighs at least somewhat in his favor.

## B. While Hobbs Has Established That He May Suffer Some Irreparable Harm, He Has Failed To Establish That The Requested Injunction Would Prevent That Harm.

Having cleared the first hurdle, though, Hobbs stumbles on the second. This prong of the preliminary injunction inquiry requires the movant to show that he or she would suffer irreparable harm absent relief, and that the requested injunction would prevent that harm. *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) ("It is appropriate to use a preliminary injunction *to avoid harms* to goodwill and competitive position.") (emphasis added) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)). Hobbs fares alright on the first part of that—identifying an irreparable harm—but not so well with the second part—redressability.

A harm is "irreparable" when it is not fully compensable by money damages, or where those money damages would be highly speculative or difficult to calculate. *Basicomputer*, 973 F.2d at 511 ("[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to

calculate."). Here, Hobbs suggests that, absent an injunction, he will be irreparably harmed in that he will "not be able to make a living. His well-crafted reputation in the insurance industry will be irreparably tarnished, and he will face financial ruin." (Pl. Post-Hr'g Br. In Supp., Doc. 37, #1404). Hobbs testifies that, since leaving Fifth Third in late 2020, he has been able to earn only $10,000 to $15,000 "despite his best efforts to earn new business while avoiding the appearance of violating" the non-solicitation covenant. (*Id.*).

Defendants, for their part, point to the "narrowly tailored" scope of the non-solicitation provision, arguing that it does not prevent Hobbs from working in the insurance industry or developing new business. (FRP Post-Hr'g Br. In Opp., Doc. 40, #2157). They also note that only approximately 13 months remain on the restrictive covenants, and the fact that, should Hobbs ultimately prevail on his contractual claims, his financial harms could be "remedied with a monetary damage award." (*See id.* at #2157–58). To FRP's point, the Court notes that the non-solicitation provision at issue here is narrower than a typical non-competition agreement. Hobbs is not prevented from plying his trade generally, and it is true that he can call on any customer save for certain customers serviced by Epic and Fifth Third without fear of reprisal.

But the relatively narrow scope of the provision alone does not mean the harm Hobbs suffers is reparable. Rather, the inquiry is whether the harm he asserts can readily be remedied by money damages. And in that regard, FRP's argument that Hobbs will be made whole should he succeed on the merits misses the mark.

To illustrate, assume Hobbs succeeds in showing that he had the right on the facts here to solicit his existing customers. Presumably, at any trial in this matter, Defendants would argue that the damages associated with depriving him of that right during the pendency of this litigation are at least somewhat speculative. After all, soliciting business does not equate to landing it. That is, the Defendants would likely argue that Hobbs would be unable to prove which accounts, if any, would have moved with him. (Notably, when the Court asked Defendants at the hearing whether they would waive such arguments, they demurred. (*See* Hr'g Tr. Vol. 1, Doc. 35, #880–82).) Or, as the Sixth Circuit put it, "interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). That is equally true whether the breaching party is the former employer or the former employee. And courts have long recognized that, when the alleged harms lead to damages that are "difficult to calculate," that is a basis for finding irreparable harm. *See RECO Equipment, Inc. v. Wilson*, No. 20-4312, 2021 WL 5013816, at *4 (6th Cir. Oct. 28, 2021) ("[U]nder our precedent, a 'competitive injury' is … irreparable harm … because of the difficulty in calculating the damages that flow from such a harm.") (internal citation omitted). Thus, the Court agrees that Hobbs has identified potentially irreparable harm.

Showing irreparable harm, however, does not end the inquiry. Hobbs must also establish that the injunctive relief he requests would *remedy or prevent* that harm. *State v. Yellen*, No. 1:21-CV-181, 2021 WL 1903908, at *14 (S.D. Ohio May 12, 2021)

23

("[T]o qualify for the 'extraordinary remedy' of a preliminary injunction, [the movant] must show that the requested injunctive relief will prevent or terminate [the] ongoing harm.") (citing *Collins Inkjet Corp.*, 781 F.3d at 279). On that front, Hobbs argues a preliminary injunction would remedy the harm because "many, if not all" of Hobbs' long-term customers—those who represent the majority of his income—would "move their business to Hobbs" if not for fear of enforcement of the covenant. (Pl. Post-Hr'g Br. In Supp., Doc. 37, #1404–05). But the fear to which Hobbs points is the customers' fears that they may become enmeshed in this lawsuit. (*See* Hr'g Tr. Vol. 1, Doc. 35, #999–1000; Doc. 37, #1370 ("[Hobbs'] customers … have stated they would have followed Hobbs wherever he went in January 2021 but for the threat of litigation …. They simply do not want to risk being involved in or in the middle of a lawsuit.")).

That "fear" does not support the requested relief that Hobbs seeks here. That is because any preliminary injunction the Court enters would not provide any basis on which Hobbs could reassure his clients that they will not become entangled in this litigation. Regardless of the Court's ruling on the instant motion, an adjudication on the merits of Hobbs' claims, and the Defendants' counterclaims, is still forthcoming. Presumably, as part of developing their damages case, the Defendants will seek information from any customer who elects to leave them to go with Hobbs. And presumably, as part of his own damages case, Hobbs likewise will seek to identify customers who would have gone with him but for Fifth Third's and FRP's interference. And, any customer Hobbs identifies will almost certainly be the subject of discovery efforts. In short, preliminary injunction or not, there is simply no way to

remove the risk for these entities that they will be "in the middle of [this] lawsuit" to some extent. (*Id.*). Thus, the Court finds that Hobbs has failed to identify an irreparable harm that would be remedied by the preliminary injunction that he seeks.

For similar reasons, the Court declines to enter an order "enjoining [Defendants] from misrepresenting to customers and potential customers that Mr. Hobbs is precluded from doing business with them." (Pl. Mot. For Prelim. Inj., Doc. 26, #382). To start, prior restraints on speech engender First Amendment concerns, although those concerns admittedly carry less weight in the context of commercial speech. *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985) ("There is no longer any room to doubt that … 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'") (citation omitted). But even as to commercial speech, courts are rightly hesitant to enjoin speech that is true, and the statements at issue here ultimately may prove true if Defendants prevail on the merits at trial. *See New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1084 (C.D. Cal. 2003) (denying motion for preliminary injunction on prior restraint grounds and noting that, while false or deceptive commercial speech does not enjoy First Amendment protection, determination of the truth or falsity of defendant's statements was inappropriate at the preliminary injunction stage). Hobbs is free to engage in counter-speech (i.e., tell the customers that Defendants' assertions are wrong), but the Court stops short of enjoining either party from sharing their version of the events.

In short, although Hobbs has shown that he may suffer irreparable (or at least difficult-to-compute) harm during the pendency of this litigation, the relief he requests will not remedy that harm. Because the Court concludes that the second element of the four-prong analysis is not met, the Court is satisfied that preliminary injunctive relief is improper. That being said, the Court will briefly consider factors three and four.

## C. Neither The Harm To Third Parties Nor Service Of The Public Interest Strongly Supports Entry Of The Requested Injunction.

The third and fourth factors of the preliminary injunction inquiry are, respectively, whether the requested injunction would cause substantial harm to third parties and whether it would serve the public interest. *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018) (citing *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017)). The Court finds that neither of these considerations strongly support granting the requested injunctive relief here.

Hobbs insists that issuance of an injunction would benefit, rather than harm, third parties (namely, Hobbs' former customers) because it "would lift an unnecessary restraint on trade and allow them to continue their business with Hobbs without fear of consequence." (Pl. Post-Hr'g Br. In Supp., Doc. 37, #1408–09). But, while those customers may have an interest in following Hobbs, the preliminary injunction Hobbs seeks will do nothing to facilitate that. As noted above, those customers are free to go with Hobbs now. Indeed, Hobbs is not even enjoined from soliciting them. To be sure, they may become involved in this litigation if they do so (or, as noted, even if they don't), but for all the same reasons that the requested preliminary injunction will not

26

provide Hobbs any basis to allay their fears in that regard, the requested injunction likewise will not work directly to do so. And, to the extent that "they should be free to [do business with Hobbs] without fear that doing so could cause them or Hobbs to defend a legal action," (Pl. Post-Hr'g Br. In Supp., Doc. 37, #1409), at least one of those ships has sailed: Hobbs is embroiled in a legal action of his own making.

As to the fourth prong, the instant dispute is, at bottom, a contract action between private parties. Hobbs argues that an injunction would serve the public interest by facilitating "increased competition in the insurance marketplace, particularly where, as here, said public expressly wishes to do business with a particular individual." (*Id.* at #1410). It is true that Ohio law considers restrictive covenants suspect as restraints of trade. *Century Bus. Servs., Inc. v. Urb.*, 900 N.E.2d 1048, 1054 (Ohio Ct. App. 2008) ("[G]enerally, restrictive covenants in employment agreements have been disfavored by courts since such covenants are normally written by employers and are in restraint of trade and the right to livelihood.") (citing *Gen. Med., P.C. v. Manolache*, No. 88809, 2007 WL 2325829, at *1 (Ohio Ct. App. 2007)). But the "public" to which Hobbs refers is in fact limited to the long-term customers wishing to do business specifically with him—all parties agree that Hobbs is free to solicit and accept business from customers apart from those he serviced at Epic and Fifth Third. And the Court has already addressed above the interests of those long-term customers.

FRP identifies the public's interest in maintaining the sanctity of contractual relations and asserts that such an interest would be best served by denying Hobbs'

motion. (FRP Post-Hr'g Br. In Opp., Doc. 40, #2160). Of course, Hobbs also advances a similar argument, albeit in the opposite direction. (*See* Pl. Post-Hr'g Br. in Supp., Doc. 37, #1410 ("[T]he public is not served by the enforcement of restrictive covenants following prior intentional and material breaches by the employer ….")). But both these arguments boil down to a general interest in upholding the law. Of course, the public has an interest in the just administration of contract law, but to consider such an argument at the fourth prong of the preliminary injunction inquiry would do no more than rehash the likelihood of success analysis. *See Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 358 (3d Cir. 1980) ("If the interest in the enforcement of contractual obligations were the equivalent of the public interest factor …, it would be no more than a makeweight for the court's consideration of the moving party's probability of eventual success on the merits.").

As a result, neither the third nor fourth prong of the analysis weighs strongly in favor of granting the injunctive relief sought. But, even if they did, that would not suffice to overcome the fact that the relief Hobbs seeks will not remedy the harm that Hobbs articulates.

## CONCLUSION

For the reasons above, the Court **DENIES** Hobbs' Motion for a Preliminary Injunction (Doc. 26).[2] The Court's decision to deny Hobbs' Motion, however, should

---

[2] In their post-hearing briefing, the Fifth Third Defendants raise an objection to Hobbs' use of evidence not formally admitted at the July hearing and request that the Court not rely on the objected-to materials. (Fifth Third Post-Hr'g Br. in Opp., Doc. 39, #2092–93). Because the Court denies Hobbs' motion, any consideration of these materials has not prejudiced the Defendants, and the Court considers Defendants' objection moot.

not be read to suggest that the Court would readily grant injunctive relief *against* Hobbs. As already noted, the language of the 2020 IP is opaque at best on assignability, which arguably benefits Hobbs, thus raising a difficult hurdle for Defendants to clear at the outset should they choose to seek injunctive relief. Then there is the separate issue of unclean hands. Courts will "deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995) (citing *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 126 (M.D. Pa. 1992)). Some of Hobbs' (admittedly unproven) allegations raise at least some concerns along those lines. Of course, the Court need not, and thus does not, decide today whether, or to what extent, that doctrine applies here.

  **SO ORDERED.**

November 29, 2021
**DATE**

        **DOUGLAS R. COLE**
        **UNITED STATES DISTRICT JUDGE**